J. M. BOULDIN AND ROBERT SANDERS *v.* JOHN C. LOCKHART, Chairman of the County Court, of Grundy County.

1. CONTESTED ELECTION. *County Court, power of, to reverse an election as to the removal of a county seat. Certiorari and supersedeas.* The powers granted the Quarterly County Court by the Act of 1873, ch. 103, ¿7, to count and declare the result of the votes cast in any county for the removal of its county seat, are not judicial, and the Legislature did not intend to authorize a review of the proceedings of said Court by writs of certiorari and supersedeas to the Circuit Court.

Cases cited: Duggan *v.* McKinney, 7 Yer., 21; Durham *v.* The United States, 4 Hay., Cooper's Ed., 54, 69; Dodd *v.* Weaver, 2 Sneed, 670; Wilson *v.* Lowe, 7 Cold., 153; United States *v.* Ferreira, 13 Howard, 40; County Court of Obion *v.* Marr, 8 Hum., 634; Covey *v.* The Justices of Campbell County, '5 Sneed, 513; Wade *v.* Murry. 2 Sneed, 50.

Code cited: ¿¿3123–6.

Statutes cited: Act of 1873, ch. 103; Act of 1852, ch. 32, 54; Act of 1844, ch. 99.

2. SAME. *Same. Power of the County Court to hear testimony. Evidence.* Under the Act of 1873, the County Court has no power to receive parol proof to reject certain votes, and purge the polls.

3. "CONCURRENCE." *Construction of.* The word concurrence, ¿6 of ch. 103, of the Act of 1873, is construed to mean an active, affirmative act on the part of the voter.

4. UNCONSTITUTIONALITY. *Of Act of* 1873. §6 of Ch. 103, of the Act of
   1873, is unconstitutional and void, yet the remainder of the Act is
   unaffected thereby.

Authority cited : Cooley on Con. Lim., 3d Ed., 177–8.

---

FROM GRUNDY.

---

Appeal from the Circuit Court.   W. P. HICK-
ERSON, Judge.

W. E. B. JONES for Bouldin.

W. E. COLYAR for Lockhart.

JAMES W. McHENRY, Special Judge, delivered the
opinion of the Court.

The facts of this cause, as they appear from the
original and amended petitions for writs of error and
supersedeas, are, in substance, as follows :

That the election in question, in regard to the re-
moval of the county seat of Grundy county, was held
under the Act of 1873, Ch. 103; that the County
Court of said county, at its July Session, 1873, or-
dered said election to be held on the 20th day of
September, 1873; that the Sheriff of said county did
advertise and hold said election in said county, in all
the civil districts then embraced, excepting the Eighth
Civil District; that by fraud or wilful neglect of the
Sheriff or his Deputy, there was a failure to open and
hold said election, at the voting places in said Eighth

District; that thereby several voters, at least twelve, were deprived of their right to vote; that the returns of said election were made to the Chairman of said County Court at the October Term, 1873; that said Court appointed a committee to count said vote, and said vote was also counted in open Court; that there were cast 448 votes for Tracy City, and 226 for "no removal," and one vote for "Altamont," and that an order was made, which is exhibited as a part of the petition. Said order is in these words:

"October Term, Grundy County Court, Monday, October 6th, 1873. This day the returns of the recent election, on the removal of the county seat of Grundy county, were returned to the Chairman of this Court, and it was declared by the Chairman, that the vote of 'no removal' was in the majority by two votes, as counted. Thereupon, the Chairman of the Court, John C. Lockhart, after having announced the result of said election to the Court, ordered the Sheriff to make proclamation, at the Court-house door, that the result of said election was in favor of 'no removal' by a majority of two votes, which was immediately proclaimed, as ordered, by the sheriff."

It is further alleged, that the facts occurred as set forth in said exhibit; that thereafter said County Court was induced to, and did purge the polls, and look into the votes, and examined witnesses in open Court to prove that votes had been given for "Altamont" instead of "no removal;" that said Court rejected the votes cast, aforesaid, and then made the result of the

election, 448 for "Tracy City," and 222 for "no removal," and thereupon made an order for the removal of said county seat from Altamont to Tracy City. This last mentioned order of said County Court, is made a part of said petition, and is as follows:

"Tuesday morning, October 7, 1873. On *recasting* the vote and hearing the proof, the Court is satisfied there were 448. legal votes cast for Tracy City, in the late election, at which the question of removing the county seat was submitted to the people, and there were 222 votes against removal. Thereupon the Court is satisfied that more than two-thirds of all the votes cast were for removal; and the court seeing also that more than two-thirds of the votes in the county, making the Governor's election the test, were cast for removal, and therefore the count in accordance with the voice of the people, by a two-thirds vote, order, adjudges and decrees that the county seat is removed from Altamont to Tracy City, and the Clerk of this Court will proceed to remove the books and papers pertaining to this Court, and he will remove them to Tracy City."

It appears that this last order was made by a vote of eleven Justices, in the affirmative, to one in the negative. It is further averred that parol proof was introduced, upon the investigation of the vote; that before the proof was heard, J. M. Bouldin, as attorney for citizens of said county, appeared in Court, and objected to the introduction of said proof, "from the fact that the vote had been counted, and the result

declared," that several illegal votes were cast in said election for Tracy City; that petitioners are citizens of the town of Altamont, in said county; that they are tax-payers, and own real estate in said town and county, and that petitioner, Robert Sanders, is Clerk and Master of the Chancery Court at Altamont; that petitioners appeared in open Court, as citizens and tax-payers, of Grundy county, and asked to be made parties to the proceeding, and prayed an appeal from the final order aforesaid, to the next Term of the Circuit Court of Grundy county, and proposed to execute a bond, as required by law, which prayer was refused by said County Court. It is further averred, that defendants are the Justices of the Peace of Grundy county; that said County Court, having ordered the removal of the county seat, as aforesaid, appointed the following named commissioners to locate the county seat, and take such steps as may be necessary, and erect public buildings, and to have the books and papers pertaining to the county removed to Tracy City, to-wit.: J. E. Ball, J. E. Laxon, William Winton, J. C. Lockhart and John Tipton, and that a like appeal from this last order, on like terms as from the former, was prayed by petitioners, which was in like manner refused by said County Court.

It is further alleged, that Grundy county was formed and organized in the year 1844; that Sequatchie county was formed and organized in the year 1858; and that by an Act of the Legislature, passed in 1858, a portion of the territory of Grundy county was deducted,

and the same added to the county of Sequatchie, and that Grundy county was an old county and Sequatchie a new county. The prayer of the petitioners is, that said Justices be made defendants; that writs of certiorari and supersedeas issue ; that said proceedings of the said County Court be reviewed, and that justice be done.

These are all the statements of the original and amended petitions, that need be set forth. The original petition was sworn to by J. M. Bouldin, and the *fiat* of his Honor, Jo. C. Guild, Judge of the Law Court at Nashville, obtained thereon, on the 13th day of October, 1873, ordering the issuance of said writs as prayed for, upon the execution of bond in the penalty of one thousand dollars, conditioned to pay costs and damages.

The petition was filed in the office of the Clerk of said Circuit Court, on the 15th of October, 1873, and the bond was thereupon executed, and said writs were issued and served.

At the January Term, 1874, of the Circuit Court, of Grundy county, Tennessee, after leave had been obtained to file the amended petition aforesaid, and the same had been filed, the defendants moved the Court to dismiss the original and amended petition. Upon consideration and argument of said motion to dismiss, his Honor, W. P. Hickerson, Judge of said Circuit Court, presiding, the same was allowed, and said petition dismissed. From this judgment petitioners have appealed to this Court.

1. Upon the facts presented, as aforesaid, in the

petition addressed to the Circuit Court of Grundy county, did that Court, under the Constitution and Laws of Tennessee, possess jurisdiction of the case? The seventh section of the Act of 1873, Ch. 103, is thus:

"*Be it further enacted.* That the Sheriff shall make his returns to the Judge or Chairman of the County Court, and at its next quarterly session after the election, the votes cast shall be counted and the result declared, and if the proposition to remove the county seat receive the requisite number of votes, then the County Court shall proceed to make all necessary provisions for removal."

The Constitution, Article 6, §10, provides: "The Judges or Justices of Inferior Courts of Law or Equity shall have power in civil cases, to issue writs of certiorari, to remove any cause, or the transcript of the record thereof, from any inferior jurisdiction, into such Court of Law, on sufficient cause, supported by oath or affirmation.

The Code, §3123, is: "The writ of certiorari may be granted whenever authorized by law, and also in all cases where an inferior tribunal, board or officer exercising judicial functions has exceeded the jurisdiction conferred, or is acting illegally, when, in the judgment of the Court, there is no other plain, speedy or adequate remedy." See, also, §3126.

The power of the Legislature, under the Constitution, to regulate the remedy by writ of certiorari, so as not to abridge the rights of the citizen, cannot be

successfully questioned. *Duggan* v. *McKinney,* 7 Yer. 21. Assuming this power, the Legislature, in Code, §3123, has proceeded to prescribe what shall be the limits and conditions of the remedy by writ of certiorari, in general terms. It is certain there is no specific legislation regulating the remedy in question, as applicable to the precise facts detailed as aforesaid. The case must, therefore, if this remedy be allowable, fall within the scope of §3123, The section of the Constitution quoted, requires that the removal shall be of a "cause or the transcript of the record." It shall be from an "inferior jurisdiction." It shall be "on sufficient cause." The Legislature, in the exercise of its power to regulate the writ, has provided that the inferior tribunal shall be such, or the board, or the officers, as is invested with judicial functions.

To sum up, under the Constitution and the Law, before the writs of certiorari can be invoked or awarded, there must be a "cause," the inferior jurisdiction, whether a tribunal, board, or officer must have exercised judicial functions; and sufficient cause must be shown for the removal. And under §3123, of the Code, other facts must exist to authorize the remedy in question. The inferior tribunal must have exercised its jurisdiction, or must be acting illegally, and further, in the judgment of the Court, or officer granting the writ, it must appear "there is no other plain, speedy or adequate remedy."

These observations are confined specially and ex-

clusively to the sections of the Constitution and Code above copied. We proceed to an examination of the authorities on this question.

In *Durham* v. *The United States*, 4 Hay., (Cooper's Ed.) 54, 69, it was held, the proceedings of a court-martial commenced under the laws of the State, although the fine be claimed by the United States, may be reviewed in the Circuit Court upon certiorari. This was a case in which a fine was assessed against Durham by a court-martial for Blount county, for delinquency in not appearing when drafted. This proceeding of the court-martial was clearly judicial in its character. The case of *Dodd* v. *Weaver*, 2 Sneed, 670, was a contest as to the right in, and title to, the office of constable. The Court in that case, say: jurisdiction to try contested elections for Justice of the Peace and constables, is conferred on the County Court by the Act of 1852, Ch. 54, and it is made the duty of the Court to hear proof and decide the case upon evidence. The return of the Sheriff is not conclusive, but merely *prima facie* evidence of the right to the office; and the function of the County Court is not ministerial but judicial, as it relates to a matter in litigation. See, also, authorities therein cited. The board of commissioners appointed under the law, to set apart a homestead to the head of a family, exercised judicial functions, and their action, if illegal, may be superseded in a proceeding for writ of certiorari. *Wilson* v. *Lowe*, 7 Cold., 153. In the case of the *United States* v. *Ferreira*, 13 Howard, 40, the Supreme Court

of the United States held, that an Act of Congress having authorized the District Judge of the United States for Florida, to adjudicate on claims for injuries suffered by inhabitants of Florida by the operations of the American army therein, which claims were to be paid if the Secretary of the Treasury should, on a report of the evidence, deem it equitable; this was not an authority conferred on the District Judge to exercise any judicial power of the United States under the Constitution, but, on the contrary, in such case the Judge acted as a commissioner, and no appeal lay.

In the case of the *County Court of Obion* v. *Marr*, 8 Hum., 634, the county ordered the levy of a tax for the purpose of building a new jail. Judge Turley, in delivering the opinion of the Court in that case, says: "The assessment is not a decree or decision of the County Court, from which an appeal is given by the Acts of 1844, Ch. 99, but is a municipal provision made for the regulation of the fiscal affairs of the county, and from which no appeal is given. If the assessment be made by the Justices, without, or in violation of authority, it is a void act, and the collector would not be protected by it in levying the taxes, and would be liable to an action for so doing." An appeal from the County Court therein was dismissed by this Court. The case of *Covey* v. *The Justices of Campbell County*, 5 Sneed, 513, is this: "The plaintiff, a citizen of Campbell county, prayed an appeal from the order of the County Court, of said county, for the building of a Court-house. The appeal

was denied him, and he brought the matter, by certiorari, before the Circuit Court of said county. The Circuit Judge dismissed the petition. The plaintiff appealed, in error." Judge Caruthers says: "The first and only question that need be considered, is, whether any citizen of a county has the right to appeal from such an order of the County Court. We think it clear that no such right exists. All those decrees or decisions touching the rights of any particular individual, may be appealed from by the person so affected, but none other." Again: Here no tax was laid, but only a police order contemplating an improvement, which might result in a future assessment of a tax to raise the funds necessary for the purpose. But even if this assessment had been made at the time, the case referred to settles that no appeal would lie. If the objections stated in the petition are such as to render the order illegal and void, it will be for any person who may ask a benefit under it, or be affected by it, to make the objection, not a volunteer. The judgment dismissing the certiorari was right, and must be affirmed.

In *Wade* v. *Murry*, 2 Sneed, 50, it was held by the Court, under the Act of 1854, Ch. 32, that a special tribunal was created for the trial of contested elections of Judges and Attorneys-General, of which the person holding the office of Chancellor for the division in which the contest may arise, is constituted the Judge. The decision of this tribunal is final and conclusive upon the parties, from which no appeal

or writ of error lays, to this Court. In such case the remedy by certiorari was not admissible, to revise, in the Circuit Court the decision of a Chancellor, unless there was such a substantial departure from the course of proceeding prescribed in the Statute as would render the proceedings void. That was a case involving private rights to an office. Applying these principles to this case, what is the character of the powers conferred on the County Court by §7 of the Act of 1873, hereinbefore quoted? It is manifest that the Chairman of the County Court is thereby simply constituted the custodian of the returns, which are required to be made to him by the Sheriff, and which returns are confided to him for safekeeping, as the principal officer of the county, and to the end that he may present them to the next quarterly session of the County Court after the election. When he has discharged these duties as to the returns, his power is terminated as to them as Chairman. It devolves, therefore, on the Quarterly County Court to count the votes, declare the result, and if the proposition to remove the county seat received the requisite number of votes, to proceed to make all necessary provisions for the removal. The fact that these duties are imposed on the County Court does not, of itself, make them judicial. That tribunal is clothed, in various respects, with functions which are judicial, *quasi* legislative, police and ministerial. It is the nature of the power conferred, and the mode of its exercise, and the objects to be accomplished, which determine

18—vol. 3.

the nature of such power as judicial or otherwise. The omission of the Legislature to provide for an appeal or writ of error or certiorari in such cases, is to be taken as an evidence that a review on the merits, or otherwise, was not contemplated in the Circuit Court. It seems reasonably clear, that the powers thus conferred on the County Court were not conferred on it as a judicial function, to be exercised in the ordinary forms of a Court of Justice. The Act does not seem to contemplate that there is to be any suit. No parties, in the legal acceptation of the term, are to be made; no process is provided for; no contested election seems to have been within the scope of the legislative intent. The fifth section of the Act is as follows : " That the Sheriff shall then open the polls and hold an election in each precinct in the county, and each voter shall put on his ballot the name of the place to which he desires the county seat removed, or the words no removal."

The Quarterly County Court, under this Act, have certain well-defined duties to perform. The Sheriff, the returning officers in the various civil districts of the county, the Judges and the Clerks of the election, are all presumed, in the absence of proof to the contrary, to have done their respective duties in the manner prescribed by law. All the returns of the election are to be produced to the Court. Thereon, the Court proceeds to count the number of votes for removal, as appears from the returns themselves, and also, the number of votes for no removal. This is simply a

matter of calculation.   If the number of votes when
aggregated for removal, is not two-thirds of all the
votes cast in the election, it is clear the proposition
to remove the county seat has failed, and the result
shall be so declared.   But, if it appears, that the ag-
gregate number of votes cast for removal is two-thirds
or more, of the entire vote cast in the election, then
the Constitution of the State, jointly with the Act,
impose an additional duty, namely, to ascertain the
entire number of qualified voters in the county at
the time of the election; and if the number of votes
cast for removal be two-thirds of the entire number
of qualified voters in the county, then the proposition
for removal has carried, and the Court shall proceed
to decree the result accordingly.   In any view, the
main duties of the Court, in the matter, are those of
calculation.   It is often a matter of difficulty to as-
certain and determine when the duty to be performed
assumes a judicial character.   The exact line of sepa-
ration is not, in this case, easily traced.   The ascer-
tainment of the number of qualified voters in the
county, in the event, upon a count of the votes that
duty arises, seems to partake, in some sense, of a
judicial judgment; but not to the extent, we infer, to
characterize the proceeding in its entirety, as author-
ized by the Act, as judicial.   It appears, in this case,
that the Quarterly County Court did receive parol
proof, reject certain votes, and purge the polls.   It
is assuredly obvious, that this action was beyond the
scope of its power, as conferred in, and defined by

the Act of 1873; but whether such action was judicial or not, we do not decide. But we do hold, that such action, whatever may be its character, is not reversable in the mode pursued in this case, because of such, or its illegality. · It follows, therefore, from the foregoing authorities, and the construction we have given to said section, that the powers conferred on the Quarterly County Court thereunder are not judicial; that the Legislature did not intend or authorize a review of the proceedings of said Court, in this mode, and that consequently, the action of the Circuit Court in dismissing the petition was correct. In view, however, of the importance of other questions discussed at the bar, and for the purpose of avoiding illegal action hereafter, in reference to those questions which are of a public and general nature, we have deemed it not improper, in this opinion, to state the opinion of the Court, in regard thereto.

2. It is insisted by the counsel of petitioners, that the Act of 1873, Ch. 103, is unconstitutional. The sixth section thereof is in these words:

*Be it further enacted,* That the county seat shall not be removed to any place unless a vote is cast for the removal to said place equal to two-thirds of the votes cast in the next preceding Governor's election. A part of Section 4, Article 10, of the Constitution of 1870, is thus: "No part of a county shall be taken off to form a new county, or a part thereof, without the consent of two-thirds of the qualified voters in such part taken off, and when an old county is

reduced for the purpose of forming a new one, the seat of justice in said old county shall not be removed, without the concurrence of two-thirds of both branches of the Legislature. Nor shall the seat of justice of any county be removed, without the concurrence of two-thirds of the qualified voters of the county."

Our first inquiry on this point, is, what do the terms concurrence of two-thirds of the qualified voters of the county mean? In the case of *Cocke* v. *Gooch,* MS., opinion, delivered at Jackson, in 1871, the first clause of the Constitution above copied, came before this Court for construction. That clause is: "No part of a county shall be taken off to form a new county, or a part thereof, without the consent of two-thirds of the qualified voters, in such part taken off." The Court say, the word "consent," here means the active concurrence, and cannot be substituted for by a passive acquiescence. Instead of presuming that those who did not vote in the election, meant by their non-action to submit to the result of a count of the votes *cast,* we hold, that a proper reading of the Constitution and enabling Act, authorizes those who did not vote to conclude that their votes against the project could avail nothing, as a fixed affirmative numerical strength was absolutely necessary to the success of the new county." Such is the law. This construction of said clause is strengthened by a citation in said opinion, of the different reading of a part of Section 29, of Article 2, of the Constitution, in regard to the credit

of a county, city or town given, or loaned to, or in aid of any person, company, association or corporation. Then follows this language: "Except upon an election to be first held by the qualified voters of such county, city or town, and the assent of three-fourths of the votes cast at said election."

In the clause under discussion, in this case, the only difference in the language employed is, that "concurrence" is used instead of consent. These words are used in that part of the Constitution we are construing synonimously and interchangeably. All the reasons which have been stated or exist, for construing consent to mean an active, affirmative act, on the part of the voter, to manifest his consent, apply with equal force to give a like construction to the word "concurrence," and this we do. It follows, the sixth Section of the Act in question is unconstitutional. The Constitution requires two-thirds of the qualified voters in the county to concur in the removal. The mode of concurrence is left to be prescribed by the Legislature. The section of the Act we are considering, requires a vote of two-thirds of the qualified voters of the county, on the basis of "the next preceding Governor's election." The Constitution requires two-thirds of the qualified voters at the time the vote is taken. The sixth section is repugnant to the Constitution, and is void. The number it requires, we add, may be the same as that demanded by the Constitution, It may be more or less. The number of qualified voters in the county, when the vote is taken,

is a question of fact, to be determined like all other questions of fact, upon the proof. The number of votes at the next preceding Governor's election may, perhaps, be looked to as evidence in ascertaining the number of qualified voters in the county when the vote was taken, but not otherwise. The increase and diminution of voters, consequent on immigration and emigration of voters, keeps the voting population of a county in continual fluctuation.

3. The question now arises, if the sixth Section of the Act of 1873, be unconstitutional, are its other sections valid and constitutional? The rules on this subject are thus laid down by Judge Cooley, in his work on Constitutional Limitations. He says: "A Statute may contain some (unconstitutional) provisions, and yet the same Act, having received the sanction of all branches of the Legislature, and being in the form of law, may contain other useful and salutary provisions, not obnoxious to any just constitutional exceptions. It would be inconsistent with all just principles of constitutional law, to adjudge these enactments void, because they are associated in the same Act, but not connected with, or dependent on, others which are unconstitutional. When, therefore, a part of a Statute is unconstitutional, that fact does not authorize the Courts to declare the remainder void also, unless all the provisions are connected in subject matter, depending on each other, operating together for the same purpose, or otherwise so connected together in meaning, that it cannot be presumed the Legisla-

ture would have passed the one without the other. The constitutional or unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand though the last fall. The point is not whether they are contained in the same section, for the distribution into sections is purely artificial; but whether they are essentially and inseparably connected in substance. If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must he sustained. The difficulty is in determining whether the good and bad parts of the Statute are capable of being separated within the meaning of the rule." Cooley's Con. Lim., 3d edition, 177, 178.

Let us apply these rules to the Act of 1873, Ch. 103. Let us suppose the Legislature had wholly omitted from the Act the sixth section. In such case no serious difficulty could have arisen. The Constitution itself provides, as we have seen, that the number of the votes concurring for the removal of the old county seat must be two-thirds of the qualified voters of the county. This number cannot be varied by legislation. All that was necessary to carry this provision into effect, was for the Legislature to yield its assent, and direct the mode in which such concurrence should be manifested. And the fact that the sixth section is declared unconstitutional, can have no

greater effect than if it had been wholly omitted from the Act.    The Constitution, in this clause, is self-op-erative.    It co-operates, so to speak, with the other sections of said Act, and taken together, there remains legislation adequate to carry out and effectuate fully the legislative will, as evidenced by the various re-maining sections.    The leading, primary and funda-mental purpose of the Act, was to enable the people, in conformity with the Constitution, to remove the county seat.    That power remains with the sixth section declared unconstitutional, and the clause of the Constitution under consideration, in place thereof exe-cuting itself.

4. It has been further insisted, that if the Act of 1873, be held constitutional, then Grundy county is not embraced therein.

The first Section thereof is in these words : " That hereafter, when the people of any county shall desire to remove their county seat, except when the old county has been reduced by the fraction of a new county, it shall be done in the following manner." It is argued by the counsel of petitioners, that Grundy county is within the exception ; that it is an old county, which has been reduced by detaching therefrom a fraction of its territory, and adding such fraction to the new county of Sequatchie, within the meaning of the section last aforesaid ; and the clause of the Con-stitution heretofore quoted on this subject, and that consequently, said section of the Act of 1873, does not embrace Grundy county.    We have fully con-

sidered this position. We do not think it sound. The length of this opinion forbids any further argument or elucidation. Our conclusion is, that Grundy county falls within said Act, and is not included in said exception.

On the facts of this case, as presented in the petition for a writ of certiorari, whether there be any judicial remedy, and what that remedy is, if it exist under our system, are questions upon which we intimate no opinion whatever.